# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00143-CV

---

**The State of Texas, Appellant**

**v.**

**Skyway Holdings LLC and Anderson Auto Salvage a/k/a Anderson Towing Inc., Appellees**

---

**FROM THE COUNTY COURT AT LAW NO. 3 OF BELL COUNTY
NO. 76172, THE HONORABLE F. B. MCGREGOR, JR., JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

In this appeal, the State requests a new trial after the jury awarded $508,548 as compensation for the State's condemnation of a parcel from a tract of land that was owned and operated as a salvage yard by Skyway Holdings and Anderson Auto Salvage (the Anderson Companies). The State argues that insufficient evidence supports the award because the trial court abused its discretion in admitting unreliable and irrelevant testimony from expert witnesses and in excluding relevant cross examination testimony. We disagree and affirm.

### BACKGROUND[1]

Since 1988, Harold and Sandra Anderson, through the Anderson Companies, have owned and operated a salvage yard on 17.538 acres (the Property) located on IH-35 in Troy, Texas (the City). Harold owns and operates Anderson Auto Salvage, and the Andersons jointly

---

[1] The background recital is taken from the evidence presented at trial.

own Skyway Holdings.  In 2006, the City annexed the Property, zoning it for light industrial use but allowing the Property to continue operating as a salvage yard through a special use permit.

In 2013, the State sought to widen IH-35 and filed a petition for condemnation, seeking to acquire 0.22 acres of the Property (the Parcel), leaving 17.318 acres of the Property (the Remainder Property).  The special commissioners awarded $74,429 in damages, and the Anderson Companies challenged the award and demanded a jury trial.  By agreement, the parties set April 11, 2013, as the valuation date—i.e., the effective date of the taking.  Before trial, the Anderson Companies designated Josh Korman as an appraisal expert, Charles Dunn as a real estate expert, and Harold as a witness testifying under the Property Owner Rule, *see Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 157 (Tex. 2012) (excepting property owners from requirement that witnesses must otherwise establish qualifications to express opinion on land values).  The State moved to exclude their opinions on various grounds, which the trial court denied after a Texas Rule of Evidence 702 gatekeeper hearing.  The Anderson Companies also filed a motion in limine to prevent reference to business income after the taking, which the trial court granted.

The jury trial occurred over three days in October 2018 and primarily consisted of the testimony of the parties' experts.  Before the cross examination of Harold, the State's counsel again requested a ruling on whether he could question Harold as to increased business revenues following the taking.  The trial court denied the request but allowed counsel to ask whether the business is still ongoing.  At the close of trial, the Anderson Companies requested between $508,548 and $1 million in compensation, and the State asked for between $74,875 and $96,206 to compensate the Andersons.  The charge presented the following question to the jury:

2

> As of April 11, 2013, what do you find is the difference between the Market Value of the Defendants' Whole Property immediately before the condemnation and the Market Value of the Defendants' Remainder Property immediately after the condemnation, taking into consideration the nature of any improvements and the use of the part being acquired along with damages to the remaining property, if any?

During deliberation, the jury asked the trial court the following question:

> To clarify, the State recommends that amount of 74,875 to 96,206. And the Defense recommends an amount of 508,548 to 1 million. Are we able to award an amount between 74,875 and 1 million, or do we have to stay within these ranges[?]

The trial court submitted the parties' joint response: "You are permitted to award any number between $74,875 and $1 million as long as it is supported by the evidence." The jury returned with a verdict of $508,548, and the trial court rendered judgment on the verdict. The trial court denied the State's motion for new trial, and this appeal followed.

## RELEVANT LAW AND STANDARD OF REVIEW

When real property is taken for public use, the Texas Constitution requires adequate compensation. *See* Tex. Const. art. I, § 17. When only part of a tract is condemned, "adequate compensation is required for both the part taken and any resulting damage to the remainder." *County of Bexar v. Santikos*, 144 S.W.3d 455, 459 (Tex. 2004). Damages "are generally calculated by the difference between the market value of the remainder property immediately before and after the condemnation, considering the nature of any improvements and the use of the land taken." *Id.* The trial court "must first determine if claimed damages are compensable" and then "admit evidence accordingly." *State v. Bristol Hotel Asset Co.*, 293 S.W.3d 170, 175 (Tex. 2009) (per curiam).

3

We review a trial court's evidentiary rulings for abuse of discretion—e.g., acting without regard for any guiding rules. *See Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016). "To testify as an expert, a witness must be qualified, and the proposed testimony must be relevant to the issues in the case and based upon a reliable foundation." *Gunn v. McCoy*, 554 S.W.3d 645, 666 (Tex. 2018). "The trial court's role is not to determine the truth or falsity of the expert's opinion" but "to make the initial determination whether the expert's opinion is relevant and whether the methods and research upon which it is based are reliable." *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). "To be relevant, the expert's opinion must be based on the facts; to be reliable, the opinion must be based on sound reasoning and methodology." *State v. Central Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). "To reverse a judgment based on a claimed error in admitting or excluding evidence," we review the entire record and "a party must show that the error probably resulted in an improper judgment." *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). The Texas Supreme Court has "recognized the impossibility of establishing a specific test for determining harmful error," thereby "entrust[ing] the matter to the sound discretion of the reviewing court." *Caffe Ribs*, 487 S.W.3d at 145.

## DISCUSSION

On appeal, the State raises five issues. In its first three issues, the State challenges the admission of Korman's "unreliable damages opinion," Dunn's "unsupported opinions," and Harold's "unsupported valuation opinion." In its fourth issue, the State challenges the exclusion of "testimony concerning the lack of functional impact" on the business. Finally, in its fifth issue, the State challenges the sufficiency of the evidence to support the jury award.

4

**Korman's Testimony**

The Anderson Companies designated Korman, a real estate appraiser who has experience appraising salvage yards, as an expert appraiser. Texas Rule of Evidence 702 applies to the "testimony of expert appraisal witnesses in condemnation actions." *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002) (citing Tex. R. Evid. 702). "Appraisal expertise is a form of 'specialized knowledge [used to] assist the trier of fact to . . . determine a fact in issue'" and "is therefore subject to *Gammill*'s relevance and reliability requirements." *Id.* (quoting Tex. R. Evid. 702; citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998)).

The State does not contest Korman's expert qualifications or the relevance of Korman's opinion; the State challenges only the reliability of Korman's testimony. In reviewing reliability determinations, "the court 'necessarily looks beyond what the expert said' to evaluate the reliability of the expert's opinion." *Coastal Transp. Co. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997)). "[W]e do not decide whether the expert's opinions are correct; rather, we determine whether the analysis used to form those opinions is reliable." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015). "Expert testimony is unreliable 'if there is too great an analytical gap between the data on which the expert relies and the opinion offered'"—e.g., if "the expert unreliably applies otherwise sound principles and methodologies," "the expert's opinion is based on assumed facts that vary materially from the facts in the record," or "the expert's opinion is based on tests or data that do not support the conclusions reached." *Id.* (quoting *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904–05 (Tex. 2004)).

Korman applied the cost approach, which the State does not challenge. *See Central Expressway*, 302 S.W.3d at 871 ("The cost approach looks to the cost of replacing the condemned property minus depreciation."); *Williams v. State*, 406 S.W.3d 273, 284 (Tex. App.—San Antonio 2013, pet. denied) ("The first step in [the cost] approach is to determine the market value of the underlying land, free of any structures, via the comparable-sales method. That figure is then added to the cost of reproducing the existing structures less their depreciation." (citing *State v. Whataburger, Inc.*, 60 S.W.3d 256, 262 (Tex. App.—Houston [14th Dist.] 2001, pet. denied))).[2] Applying the cost approach, Korman opined that the value of the Remainder Property before the taking was $1,675,112; that the value after the taking was $1,223,735; and that subtracting the latter number from the former produces $451,377 in damages. Korman then added $56,171 as the value for the Parcel taken to produce a value of $508,548 as compensation—the same amount that the jury awarded. The State does not contest Korman's calculations of $1,675,112 or $56,171; the State contests only the $1,223,735 valuation for the Remainder Property after the taking, which Korman arrived at as shown by the following chart:

---

[2] Korman noted in his expert report, "Because of the unique nature of the subject property as an auto salvage yard with specific improvements, improved comparable sales figures are lacking in the market area and the improved comparable sales methodology doesn't accurately measure market value for this particular property." *See City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 183 (Tex. 2001) (noting that cost approach "is best suited for valuing improved property that is unique in character and not frequently exchanged on the marketplace"; that "[w]hile the cost method takes the property's depreciation into account, it still 'tends to set the upper limit of true market value'"; and that "[w]hen comparable sales figures are lacking or the method is otherwise inadequate as a measure of fair market value, courts have accepted testimony based on the cost approach and the income approach" (quoting *Polk County v. Tenneco, Inc.*, 554 S.W.2d 918, 921 (Tex. 1977))).

## REMAINDER AFTER THE TAKING

| | | |
|---|---|---:|
| Replacement Cost New | | |
| Main Improvements | $ | 214,775 |
| Site Improvements | + $ | 433,815 |
| Replacement Cost | $ | 648,590 |
| Entrepreneurial Profit (15%) | + $ | 97,289 |
| Cost New | $ | 745,879 |
| Depreciation (Physical/Functional/External) – Approx. 75% | - $ | 558,917 |
| Improvements | $ | 186,962 |
| Entitlement Enhancement (30%) | + $ | 56,089 |
| Depreciated Value of Improvements | $ | 243,051 |
| Land: 754,372 SF @ $1.30 PSF | + $ | 980,684 |
| **Remainder After the Taking** | $ | 1,223,735 |

Looking specifically at the "Depreciation" row, Korman explained that the "depreciation before [the taking] was 28 percent" based on the age of the improvements but after the taking "[t]hat has been increased [to] 75 percent because we believe there's functional obsolescence." Korman defined "functional obsolescence" as "caused by a flaw in the structure, materials, or design of an improvement when the improvement is compared with the highest and best use and most cost effective functional design requirements at the time of the appraisal."[3] At trial, he explained "the math is once they're physically depreciated 28 percent, we then depreciate another 65 percent" for functional obsolescence and "just because you're multiplying 28 percent, 65 percent roughly comes out to be 75 percent." This 65% depreciation value was applied to all the improvements.

The State raises two challenges to the testimony. First, the State complains that "Korman employed no test to measure the site's utility, either before or after, against market standards" to calculate the 65% depreciation value. Second, the State challenges the reliability

---

[3] Relying on a real estate appraisal dictionary, Korman's report defined "Functional Utility" as "Impairment of the functional capacity of a property or building according to market tastes and standards; equivalent to functional obsolescence when ongoing change makes layouts and features obsolete and impairs value."

7

of Korman's application of a 65% depreciation value to "*all* improvements on the remainder, including the gravel and fencing on the back seventeen acres of the salvage yard storage area, far removed from the driveways and vehicular traffic" and argues that "there is no evidence the gravel and fencing on the remaining seventeen acres suffered any loss of functionality."

As to the first challenge, Korman testified that he first determined the effective age of the improvements on April 11, 2013, right before the State's taking. He concluded that "we were looking at an effective age that was between 23 and 25 years" based on "the actual age of the improvements and how they were being used" and that "when you blend in all of the improvements including the buildings, everything down to the gravel paving," the overall physical depreciation "was 28 percent roughly." Korman explained in his report that "based on market participants, interviews with property owners and their representatives, and a review of the site plans and documents provided by Hutson, the highest and best use remains for an auto salvage facility, but at a diminished function"—in other words "functional obsolescence . . . results in increased depreciation." He described the taking's effect upon the improvements:

> Due to the location of the taking the northern driveway will be relocated approximately 110 feet south from its location before the taking. The location of the taking and the change in access (including the relocation of the northernmost driveway which was the primary entrance for retail and truck traffic) create material functionality, internal site circulation, safety, security, and operation problems. Traffic can no longer circulate from the northern driveway, pass the primary building and drop-off area, and exit the southern driveway. The primary building is now isolated from the circulation pattern. Ultimately the taking causes site, circulation, and safety issues after the taking as demonstrated by the 2 operational options analyzed by *Hutson Land Planners & Development Consultants, LLC* (Hutson).[4]

---

[4] Korman considered the two cure options proposed by Hutson but concluded that these options are not financially feasible. The State does not challenge Korman's opinion as to the rejection of the cure options.

8

At trial, he discussed at length these issues that resulted from the taking—including those related to "proximity," "safety," "security," and "internal circulation"—explaining:

> There's circulation challenges where before you used to go in front of the office and down by the dismantling area. . . . [Y]ou had a checkpoint there at the office. You know there was security. You have unloading challenges now. You have traffic flow issues with customers, you know -- you know, customers hitting cars going left and trying to instruct trucks to go right. . . . [Y]ou have proximity issues. Rough numbers here, you were 70-plus feet away from the right-of-way beforehand. And now you're roughly 45-ish feet -- 40 to 45 feet from the right-of-way now. And that's the dismantling area here, office here. . . . In this situation, it's not good.

He testified that for these reasons the "property doesn't work the same" after the taking, the depreciation "has been increased 75 percent because we believe there's functional obsolescence," and what "the 75 percent represents is things are getting towards the end of their useful life." Korman further explained that the "the increase from roughly 28 percent to 75 percent" for functional obsolescence includes "a continued risk" that the City would not provide a permit if the Anderson Companies tried to fix the problems with the Property; a "risk factor [of] maybe losing that 30 percent enhancement"; and "that you're 40 percent closer to the right-of-way," which "are things that the buyers and sellers are going to want to know." *Cf. State v. Little Elm Plaza, Ltd.*, No. 02-11-00037-CV, 2012 WL 5258695, at *12 (Tex. App.—Fort Worth Oct. 25, 2012, pet. dism'd) (mem. op.) ("[A]n expert may testify about how an uncertainty with regard to a governmental action may have affected the market value (in other words, how potential buyers and sellers would weigh the risks related to the property) on the date of the taking[.]").

At trial, Korman explained that he used "the same methodology" as he did in determining the depreciation before the taking, relying on the "Marshall & Swift Guide" (the

Guide) to calculate the improvement value, given the functional obsolescence the property had following the taking. Both Korman and the State's appraiser testified that professional appraisers often rely on the Guide to calculate depreciation. Specifically, Korman testified that he relied on a chart in the Guide called the "Depreciation Chart." The instructions for using the chart in the Guide explain that "it is simply a matter of looking up the typical building life and the calculated effective age." The "effective age" is "simply the number of years of apparent age, which can be established by deducing estimated remaining life from typical life expectancy." The depreciation percentage is then "determined by finding the typical life of the building (top of the chart), the effective age (side of the chart): the intersection of the two is the depreciation percentage." In deposition testimony included in the record, Korman explained:

> [W]e believe that [the taking] had a significant impact on the property, bringing it closer to the end of its economic life. And then we looked at the charts to see what type of depreciation you see for properties at the end of their economic life. . . . [T]hrough the Marshall and Swift chart, yeah, at the end of the life, it's in that 75 to 80 percent range as far as depreciation . . . [and] that's how we got there.

Thus, Korman "looked at what properties are depreciated at the end of their economic life, being in that 75 to 80 percent range" and noted "[t]hat 75 percent is representative of 42-year-old effective age building," according to the chart. He explained that "[p]hysically" the improvements on the Remainder did not "age 21 years as a result of the State's acquisition" but "economically, it did." He testified that "[t]his is where the real difference is": "[t]he depreciation [of the improvements] before was 28 percent" but after the taking "[t]hat has been increased 75 percent because we believe there's functional obsolescence" and "[w]hat that 75 percent represents is things are getting towards the end of their useful life."

10

Korman testified that he visited the Property multiple times, that he has specific experience appraising salvage yards throughout Texas, that neither he nor Harold were aware of any salvage yard sales in this market area, and that salvage yards are "not a common property type, not just in this marketplace but anywhere that transacts." In deposition testimony included in the record, Korman explained that to determine the functional obsolescence value, "I went to the marketplace, but, like I said, facilities that are like this, I was unable to find those types of transactions of properties that function like this," that "people don't develop properties in the manner that this one now sits," and that "I'm not aware of there being something that I can test it against." At the Texas Rule of Evidence 702 gatekeeper hearing, when asked whether he had hard numbers that support the diminished value for functional obsolescence, Korman responded that "[w]e have looked at other studies that look at other functional issues" but "[w]e just don't have any other properties like the subject that have actually traded where we can actually analyze that just because that's not the way they're developed." Korman stated that he did look at other appraisals that helped him determine the percentage for the functional obsolescence, but he explained:

> Well, we've looked at other properties that have -- I'll kind of call it a greater functional penalty that are put on them that I believe have been turned over to you. But other than that, you know, we're looking to the Marshall evaluation charts for properties that are at the end of their economic life. . . . There are other ones that are in that range that were in that 75 to 100 percent diminution of value. However, I thought the Marshall was the best guide for us for something being at the end of their economic life. So we have looked at other numbers -- quantifiable numbers. But I do feel that those were more extreme.

And Korman described in his deposition testimony in the record that he "was erring on the side of 75 percent, which is on the low end of that range" for improvements towards the end of their economic life.

11

Given Korman's experience and the testimony as to the uniqueness of salvage yard sales, we conclude that the trial court did not abuse its discretion in admitting his testimony, including his expert opinion that the Remainder Property improvements were at the end of their economic life and therefore had effectively aged economically due to functional obsolescence the equivalent of physically aging 21 years as a result of the State's acquisition. *Cf. Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 227 (Tex. 2019) ("Although valuation testimony in other industries may be more thorough, the aircraft appraisal industry presents unique challenges in valuing specific aircraft. . . . We note that [the expert's] experience with aircraft alone may be a sufficient basis for his valuation, and coupled with the engines' issues, we conclude that he provided sufficient bases for his valuation opinion."); *Gammill*, 972 S.W.2d at 726 (holding that "[e]xperience alone may provide a sufficient basis for an expert's testimony in some cases"). Korman identified facts and reasons as to why functional obsolescence occurred and relied upon his experience and the Guide to calculate the value of that functional obsolescence based upon his judgment that the improvements were at the end of their economic life. Even if Korman's testimony could have been more thorough, the thoroughness of the testimony goes to the weight of the evidence, not its admissibility. *See Bustamante v. Ponte*, 529 S.W.3d 447, 465 (Tex. 2017) (noting experts' "testimony could have been better" but that "they did not simply state a conclusion without any explanation or ask the jurors to take their word for it"); *Williams*, 406 S.W.3d at 284 ("Texas courts have given appraisers a wide degree of latitude based on their experience when determining admissibility."); *see also Caffe Ribs*, 487 S.W.3d at 144 ("When an expert's opinion is predicated on a particular set of facts, those facts need not be undisputed. An expert's opinion is only unreliable if it is contrary to actual, undisputed facts." (citations omitted)). On this record, we conclude that the lack of a precise test

12

to calculate the specific 75 percent depreciation or to determine an effective age of 42 years for the improvements that Korman already had determined to be at the end of their economic life did not preclude the trial court from admitting Korman's testimony. *Cf. Harris Cnty. Appraisal Dist. v. Kempwood Plaza Ltd.*, 186 S.W.3d 155, 161 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (rejecting unreliability argument that expert did not "explain the math" behind adjustments because although "there was no precise mathematical formulation that lead [sic] to [the expert] using 15% as the rate of adjustment," expert "did provide a rationale for the adjustments he made," precise mathematical formulation "was not required" because "[a]ppraising property is not an exact science based on set mathematical formulas," and "the lack of a mathematical formula in this circumstance does not raise any suspicion of an analytical gap").

A disagreement between experts as to the value and existence of depreciation is part and parcel of trial, *cf. Morale v. State*, 557 S.W.3d 569, 574 (Tex. 2018) (per curiam) ("A disagreement between experts as to the value of land after condemnation is part and parcel of trial."), and "[t]he trial court's gatekeeping function under Rule 702 does not supplant cross-examination as 'the traditional and appropriate means of attacking shaky but admissible evidence,'" *Gammill*, 972 S.W.2d at 728 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)). Certainly the State was entitled to, and did, cross examine Korman on his assumptions and present evidence explaining to the jury why the State disagreed with Korman's opinions on functional obsolescence. *Cf. Morale*, 557 S.W.3d at 574, 576 (noting that "[c]ertainly the State was entitled to, and did, present evidence explaining to the jury" why expert's opinions were incorrect and that "the State was free to cross-examine [the expert] on his assumptions, but [the assumptions] did not render his testimony wholly speculative and therefore inadmissible"). But it is not our province to determine whether the jury correctly weighed the

13

evidence. *See Gharda*, 464 S.W.3d at 349 ("[W]e do not decide whether the expert's opinions are correct; rather, we determine whether the analysis used to form those opinions is reliable."); *cf. Gammill*, 972 S.W.2d at 728 (recognizing that "trial court's task is sometimes a difficult one" and that "the issue is a close one" before concluding that trial court did not abuse its discretion). We conclude that on this record the trial court did not abuse its discretion in determining that Korman's analysis in his opinions was reliable and therefore admissible.

As to the State's second challenge regarding Korman's application of the depreciation percentage for functional obsolescence to all the improvements, we also hold that the trial court did not abuse its discretion in determining that Korman's analysis was reliable. The State claims that "Korman's damage calculation included sixty-five percent depreciation for functional obsolescence of *all* improvements on the remainder, including the gravel and fencing on the back seventeen acres of the salvage yard storage area, far removed from the driveways and vehicular traffic." At trial, Korman was asked, "So because of the State's acquisition, the value of the gravel out on the site has diminished in value from the $242,086 to $81,230?" Korman responded, "Yeah. I need to be clear. I understand that's the way the math works, but we're talking about the whole property scenario. In other words, nobody comes and just buys the canopy, just buys the building, just buys the gravel, for instance. The whole property diminishes." Accordingly, in calculating the depreciation of the improvements before the taking, Korman "blend[ed] in all of the improvements including the buildings, everything down to the gravel paving," and did the same for calculating the depreciation after the taking. As he explained in his deposition testimony included in the record, the functional obsolescence is because of "general functional problems that are on the subject property for being able to operate the real estate the way it's supposed to and what it was meant to do" including "because of the

14

right-of-way line moving closer, the drive moving to the south," "proximity issues between the building, customer interference, truck traffic interference, safety, security problems." Thus, his testimony effectively was that the "general functional problems" affected the improvements on the property as a whole and how the improvements interacted with each other as a whole. The State complains that "Korman did not explain how the gravel could function 65% less as gravel due to the acquisition" and rhetorically asks, "[h]ow is land value not impacted" when "gravel is impacted"? But under the cost approach, the determination of land value is a different inquiry than the determination of the value of improvements minus depreciation; it is the existing structures and improvements that are depreciated, not the underlying land. *See Williams*, 406 S.W.3d at 284 ("The first step in [the cost] approach is to determine the market value of the underlying land, free of any structures, via the comparable-sales method. That figure is then added to the cost of reproducing the existing structures less their depreciation." (citing *Whataburger*, 60 S.W.3d at 262)). We conclude that on this record, the trial court did not abuse its discretion in allowing Korman's expert testimony that applied the depreciation percentage to all the improvements on the land.

Because we conclude that the trial court did not abuse its discretion in admitting Korman's expert testimony, we need not address the State's challenges to the other experts or its sufficiency challenge. The amount of damages the jury awarded equaled the amount of damages Korman calculated for compensation, which was lower than Dunn's or Anderson's calculated amount. Thus, even if the trial court had abused its discretion in admitting Dunn's or Anderson's testimony, the State has not shown how the error was harmful and probably resulted in an improper judgment given Korman's admitted testimony. *See Caffe Ribs*, 487 S.W.3d at 144–45. And the State's sufficiency challenge depends on the exclusion of the challenged evidence,

including Korman's testimony. We therefore overrule the State's first three issues and its fifth issue.

**State's Rebuttal Testimony**

In the State's remaining issue, the State challenges the trial court's exclusion of its rebuttal testimony. Before Harold's cross examination, the State's counsel approached the bench and requested a ruling on the Anderson Companies' motion in limine related to the State's ability to address business revenues following the taking. Specifically, the State's counsel said, "I don't want to get into the specific profits. All I want to do is ask one simple question, and that's, Since the date of value, your revenues have increased, correct?" The trial court ruled from the bench:

> This will be the order of the Court: The Court finds that the request to get into or ask the question that's been proffered will be denied. I will allow a question as to whether or not the business is ongoing. And then the Jury can determine from that standpoint whatever value they want to give to that idea. They may conclude that if it's not a viable business, it wouldn't be ongoing five years later. I don't think that's -- that may relate to functionality. You could argue that as to the question that you proffered. I will deny that.

The State then made an offer of proof, asking Harold, "Since the State's acquisition, have your revenues on that site actually increased?" Harold responded affirmatively. The Anderson Companies' counsel then asked Harold why the revenues have increased. He responded, "we really pushed the internet sales for one thing," "we're delivering a lot more parts," and "the economy is good right now."

Generally, "Texas courts have refused to consider business income in making condemnation awards." *Central Expressway*, 302 S.W.3d at 871. But the State argues that it was permitted to ask Harold a question about business revenues to rebut testimony on functional obsolescence. The State claims that the trial court abused its discretion because "the increase in

16

revenues shows the effect of the acquisition on the Property: the existing, post-acquisition configuration does not suffer from diminished utility, nor is it rendered less functional as a result of the State's acquisition."

We need not consider whether the trial court abused its discretion in excluding the question on whether business revenues increased, however, because the State has not established harmful error—i.e., that the exclusion probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Central Expressway*, 302 S.W.3d at 870. The trial court permitted a question on whether the business is ongoing. Thus, the State would have to show that evidence of increased revenues demonstrated something more than evidence that the business is ongoing such that exclusion of the former probably caused the rendition of an improper judgment or is "crucial to a key issue." *Central Expressway*, 302 S.W.3d at 870. Our review of the record does not reveal how the exclusion of evidence of increased revenues probably caused the rendition of an improper judgment. *See id.* (requiring review of record to determine if excluded evidence probably resulted in rendition of improper judgment). In the offer of proof, Anderson explained that the revenues increased because the "economy is good right now" and online sales have increased—factors that have minimal, if any, relevance to the functionality of structures and improvements on the Property. And the Texas Supreme Court has noted that business profits are generally excluded in a condemnation award because they "are speculative and often depend more upon the capital invested, general market conditions, and the business skill of the person conducting it than it does on the business's location." *Id.* at 871. Thus, given that the trial court permitted a question as to whether the business was ongoing, we conclude that the exclusion of additional rebuttal testimony regarding increased business

17

revenues did not probably cause the rendition of an improper judgment. We overrule the State's fourth issue.

## CONCLUSION

Having overruled the State's issues on appeal, we affirm.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Kelly, and Smith

Affirmed

Filed:   March 5, 2021