In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-16-00440-CV
_____

THOMAS DEARBONNE AND ANN HARRIS, Appellants

V.

SCOTT COURVILLE, Appellee

On Appeal from the 136th District Court
Jefferson County, Texas
Trial Cause No. D-196,763

MEMORANDUM OPINION

Thomas Dearbonne and Ann Harris (Appellants or Plaintiffs) appeal the trial

court's summary judgment in favor of Scott Courville (Courville or Appellee or

Defendant). We affirm the trial court's judgment.

Background

Plaintiffs filed an Original Petition in which they alleged that they were

travelling in a vehicle at night on FM 365 when they were involved in an accident,

and "they sustained personal injuries due to the negligence of the Defendant recklessly allowing his horses to run free on the public roads." Plaintiffs alleged that Courville owned the horse and that Courville was negligent in failing to keep his horses properly corralled, failing to maintain a sufficient fence, and in allowing his horses to roam freely upon the public roads. Plaintiffs alleged that such acts or omissions were a proximate cause of Plaintiffs' injuries. Plaintiffs also asserted a claim for negligence per se.

Courville filed an answer denying the claims. Later, Courville filed Defendant's First Amended Answer to Plaintiffs' Original Petition, in which Courville generally denied the allegations and asserted that he was "not the owner of the animal(s)/horse(s) allegedly struck by the Plaintiffs[,]" and he requested a jury trial. Courville filed a no-evidence motion for summary judgment, arguing that, after an adequate time for discovery, there was no evidence that Plaintiffs collided with a horse, that Courville owned or controlled the horses involved in the collision, if any, or that he owed any duty to Plaintiffs.

Courville attached several items to his motion for summary judgment including deposition transcript excerpts of Lisa King, Alan King, Sarah Smith, Donald "Stretch" Metts, and Dr. Harvey Schneiter, as well as affidavits of Dr. Schneiter and Courville. In Courville's affidavit he asserted:

In March of 2014 (including March 1st and 2nd), I owned five (5) horses (Bailey, Holly, Pearl, Bo and Oakey), all of which were pastured on my property located at 8530 FM 365. All of the horses were appropriately secured within their pastures. Further, all of the horses were healthy.

On the morning of Sunday, March 2, 2014, I again checked my fences and gates and made sure all of my water tanks were full. As with the day before, all of the fences and gates were in good working order and suitable to contain my horses. Later that morning, we left for vacation.

We arrived at our hotel around 5:00 p.m. on Sunday, March 2nd. Later that evening, I received a phone call from my sister, Lisa King, who is also my next-door neighbor. She told me there was a horse in her backyard. After telling her I was out-of-town, I told her I would have someone take care of the animal. I told my sister I was out[-]of[-]town but would call someone to look into the horse in her back yard. I immediately called Deputy Don Metts. Deputy Metts is the livestock officer for the Jefferson County Sheriff's Department. Deputy Metts said he would head there at once. After giving him time to get to my sister's house, I called him for an update. He told me that all of my horses, of which there are five, were accounted for and were healthy and uninjured. He also told me a car had wrecked just to the west of my property. I asked him to check that my horses were fine once again, and he said that they were fine. Deputy Metts assured me that my horses were fine and were not involved in any accident with a car. As a result of my conversation with Deputy Metts, I considered the matter closed.

When we arrived home on March 9, 2014, I checked each of my five (5) horses and could easily see they were all healthy and uninjured just as they had been on March 1st and 2nd.

The fences on my property at 8530 FM 365 are constructed of four (4) strands of barbed wire connected to wooden posts. I use factory-made gates and install them with factory-made hardware and fasten them with the provided chain and spring-loaded clip. I maintain the fences and gates and keep them in good condition.

I have never had an issue with any of my horses getting out of their enclosure either through the fences or gates. The only time I have had a horse get out of an enclosure was a horse pastured on another

3

property I leased five (5) or six (6) years ago. A storm caused a tree to fall and knock down a portion of the fence.

I regularly inspect the fences and gates to make sure they are suitable to contain my horses within their pastures.

Lisa King, Courville's sister, testified that she and Courville are close but the only time they are ever together is Christmas Eve at her mother's. King explained that although her backyard is not fenced, Courville's property adjoins hers and his fence line runs across the back of her yard. According to King, on the night of the car accident she was inside her house when she heard her dogs barking. She looked out of her door and she saw "a horse and then a shadow of another horse" in her backyard, and then she called Courville.

Alan King testified that two tannish brown horses were outside Courville's gate and were nose to nose with horses on the opposite side of the gate and wanted to go inside the gate. According to the excerpt, Alan testified that he let the horses back into the pasture.

Sarah Smith's deposition transcript excerpt includes testimony by Smith that when she was returning home immediately prior to hearing the accident, she did not see a horse on FM 365. She testified that she heard the accident happen seconds before turning into her driveway, and as she turned into her driveway she observed a shadow of what appeared to be a horse on Courville's property near Lisa King's

backyard, and the horse was not on FM 365. According to Smith, she saw the shadow moving towards Courville's property within seconds of hearing the accident.

Donald Metts testified in the deposition excerpt attached to Courville's motion that he talked to Courville's daughter at the house, he asked her if there were any horses out, and she said two were out. According to Metts, there were two horses standing just outside the gate, not far from the house in the pasture on the right by Courville's barn, and Metts and Courville's daughter let them back into the pasture. He testified that Courville told him over the phone how many horses he was supposed to have on his property, but Metts could not remember at his deposition whether that number was four or five horses. Metts did remember that he accounted for all the horses, that they were all on Courville's property, and that he opened the gate and let the two horses that had gotten out into a different pasture on the property back into the pasture with the other horses. Metts testified that he had a chance to examine Courville's horses, that based on his experience and training with horses he can determine whether a horse has been injured, and that the horses that were out of the pasture exhibited no signs of injury. Metts testified that he observed Dearbonne's vehicle after it was involved in the accident and it was "very much" damaged with front-end damage, windshield damage, and roof damage. Metts agreed that as a livestock officer he has seen accidents with an automobile and horse, and that, based

on his experience and training, he believed that if Dearbonne's vehicle had struck a horse that the horse would be severely injured. Metts also agreed that horses are fragile in their legs and that if a vehicle like Dearbonne's vehicle struck a horse in the legs there would be a high probability the horse's legs would be injured.

Dr. Harvey Schneiter swore to the following in his affidavit attached to Courville's no-evidence motion for summary judgment:

> . . . I currently own and operate the Fannett Veterinary Clinic, which opened in 1991. I received a doctorate in Veterinary Medicine in 1984 and completed a large animal internship at the University of Tennessee College of Veterinary Medicine. Furthermore, I completed a three-year Equine surgery residency program from Louisiana State University. As part of my Equine veterinary practice, I treat soft tissue and orthopedic injuries as well as engage in Equine sports medicine.
>
> I have extensive education and experience treating large animals, including horses. Over the last twenty-five years, I have treated and euthanized horses that have been injured in accidents, including being hit by automobiles. I am familiar with the types and severity of injuries to horses that have been struck by automobiles.
>
> I reviewed nine (9) photographs of an automobile (that are attached to this affidavit) that allegedly struck a horse. Based upon my education, training and experience, any horse struck by the car depicted in the photographs would have, in all probability, sustained the following injuries: 1) abrasions with hair loss on the legs at the level of the impact with the front of the car[, and] 2) bruising and swelling, and possibly hair loss, on the thorax and/or abdomen on the side of the body that impacted the windshield. Furthermore, the injuries would be visible immediately after the collision, and in all probability, the horse would appear visibly lame.
>
> I have never examined or treated any horse owned by Scott Courville for injuries received from an impact with an automobile. Furthermore, I did not treat or examine any horse owned by Scott Courville for any injury or illness in 2014 or 2015.

6

Schneiter testified in his earlier deposition that, assuming the vehicle involved in this accident struck a horse and the car suffered significant damage to the front end, hood, windshield, and roof, the horse involved in the accident "definitely would have to have some injury."

In response, Plaintiffs argued that "there are two distinct but supportable possibilities" about what happened[:]

> In one scenario, the "fifth" horse was struck and injured and then vanished (or was otherwise[sic] "disappeared" at a later date); in another scenario, the horse that was struck was one of the two found shortly thereafter looking to get back into the Courville homestead pasture."

Plaintiffs also argued that "there is sufficient evidence from which a reasonable jury could conclude that Courville 'permitted' the horse to be outside of its pasture as considered through the teachings of *Rose v. Hebert Heirs*, 305 S.W.3d 874 (Tex. App.—Beaumont 2010, no [pet.])." Plaintiffs attached to their response a copy of the accident report, the affidavit of Ann Harris, and the deposition transcripts of Lisa King, Sarah Smith, Scott Courville, Ray Chesson, George Dearbonne, Alan King, Donald Metts, Lawrence Merendino, Jr., and Dr. Harvey Schneiter.[1] In the

---

[1] Courville filed objections to part of the deposition testimony of Ray Chesson, George Dearbonne, and to some portions of Ann Harris's affidavit that was attached to Plaintiffs' Response to Courville's motion for summary judgment. Appellants filed no response to the objections. In a letter ruling in the clerk's record, the trial court explicitly sustained the objections. On appeal, Appellants argue this

deposition transcript of Courville, he testified that he owned five horses at the time of the accident and he has three fenced areas on his property. According to Courville, when he left on vacation, one horse was in the front pasture, two horses were in the back pasture, and the other two were in the side pasture. Courville testified that Metts was the Jefferson County Livestock Deputy and that Courville had asked Metts, as a favor, to keep an eye on his horses while he was away. Courville testified that his sister called him around 6:30 p.m. on his first day of vacation and informed him that there was possibly a horse in her backyard. Courville told her he would call Metts. Courville called Metts and asked Metts to see if there was a horse in his sister's backyard. Courville testified he called his sister back and said Metts was on his way. According to Courville, a little while later he called Metts back and Metts was at Courville's house. According to Courville, Metts told Courville that all five of Courville's horses were in the pasture, that there had been a wreck with a horse up

---

Court should consider the objected-to evidence (despite the explicit ruling made in the court's letter) because the trial court did not issue a formal order granting the objections and the summary judgment order and final take nothing judgment include language stating the trial court considered the "pleadings, the motion, the response, affidavits and other evidence on file." Appellants failed to explain on appeal why the excluded evidence is relevant or admissible, nor did they challenge the evidentiary ruling of the trial court. Appellants waived any complaint about the evidentiary ruling. Thus, we need not discuss in this memorandum opinion the evidence excluded by the trial court. *See* Tex. R. App. P. 33.1(a); *Hidalgo v. Surety Sav. & Loan Assoc*., 462 S.W.2d 540, 545 (Tex. 1971) (summary judgment evidence must be admissible to be considered by the trial court or by a reviewing court).

on the highway, but Metts did not identify whose horse or what kind of horse was involved in the accident. Courville testified he asked Metts how the horses were and Metts told him that he counted them and that all five of Courville's horses were fine and Metts would check on them again in the morning. Courville testified that when he got back to town, he and Metts talked about the accident and that Metts told him that due to the extent of the damage to the car that Metts had expected to find a dead horse and looked for days and watched for buzzards but never saw anything. Courville testified that he knows of at least three people within a mile along FM 365 that have had horses get out of their pastures in the past. According to Courville, he had no knowledge or suspicion about whose horse might have been involved in that accident, but he did not think it was any of his horses.

Lisa King testified in her deposition that she is Courville's older sister and that she has lived at her residence on FM 365 for thirty years. According to Lisa, her backyard is unfenced and after hearing her dogs bark on the night of the accident, she looked outside, and she saw a horse and a shadow of another horse in her backyard eating grass in the northwest corner of her yard. She assumed the horses were Courville's and she called him. Lisa testified he returned her call a few minutes later and he told her he would get ahold of "Stretch." Lisa testified Sarah Smith called and they talked until Scott called back. Lisa went to sit on the porch, she heard

9

a wreck to the west and told her husband, Alan. Lisa testified Scott called back to ask if Stretch had gotten there yet, but she was not sure whether Scott called back before or after she heard the wreck. Lisa testified that after the wreck she saw her husband pull up at Courville's property and talk to Stretch, and she walked over to them. Her husband told her that two of Courville's horses were standing at Courville's gate and that they opened the gate to let them in. Lisa testified that her husband and Stretch went to check on the horses and that when her husband came back home he said the horses were fine and in the gate. Lisa testified that "[t]here's a lot of people with horses[]" in their area, and she testified to at least one other horse from another landowner's property that she had seen running down the highway about four months before her deposition.

Sarah Smith testified in her deposition that she believed Courville kept some of his horses on the Pitzola property on the same side of FM 365 as her property but across FM 365 from Courville's property. She admitted that she did not know whether Courville had horses on that property and that if he testified otherwise, she would have no reason to dispute the testimony. She believed that in a "period of ten years [or] [h]owever long those horses have been there[]" the horses got out of the Pitzolas' pasture "no more than about three times that [she] know[s] of." Smith testified that on the night of the accident she was on her way home and was on the

10

telephone with Lisa King when Lisa mentioned that Courville's horses were out and in Lisa's backyard and Lisa was trying to get in touch with Courville. According to Smith, Lisa then told her that Courville was calling her and Lisa took the call. Smith testified that by then she was close to home and after a few minutes she heard a "very loud" collision "very close" to Courville's property. According to Smith, a minute or two after King said she saw Courville's horses in her backyard Smith heard the collision. She testified she turned into her driveway and within seconds of the wreck she saw a silhouette of what appeared to be a horse to her right near King's backyard and not on FM 365.

Ray Chesson testified in his deposition that for the past nineteen years he has served as the Justice of the Peace for Precinct 4 in Jefferson County. He testified that on the night of the accident, dispatch put a call out to the patrol deputies that horses were on FM 365 in Labelle, but the dispatch did not convey any information about the owner of the horses. About five to ten minutes after he heard the call from dispatch, he heard about the accident.

George Dearbonne, Thomas Dearbonne's son, testified that on the night of the accident he was sleeping, and Ann called him and told him that they had hit a horse on Highway 365 in Labelle. George testified that he went to the accident scene, it was cold and raining, and emergency vehicles were at the scene.

11

Alan King testified that he is Courville's brother-in-law and that his wife and Courville both own property with frontage on FM 365. On the night of the accident, his wife came inside and told Alan that a car had hit something down the road. After going to the scene and trying to get oncoming cars to slow down, Alan went to the Courvilles because "they had said something about horses" and there were "two horses and horses on the inside of the fence; and they were all nose to nose, and [he] opened the gate and let them in." Alan testified that as he was letting the horses back onto Courville's property, Stretch, whom Alan believed worked with Jefferson County Animal Control, arrived and "shined his light on them looking for any injuries [and] [t]here w[ere] no injuries to the horses." According to Alan, people "[a]ll up and down the highway" have horses either on their property or pastured on some other property.

In his deposition attached to Plaintiffs' response, Donald Metts testified that he had been the livestock deputy for the Jefferson County Sheriff's Department since 2009. Metts testified that on the night of the accident, Courville had called him. Courville told Metts that Courville was in Cancun. Courville's sister had called Courville because she thought there was a horse loose. Metts testified that while he was in route to Courville's property, dispatch called and said a horse had been hit by a vehicle on FM 365. Metts testified he went to the accident scene west of

12

Courville's house and asked if the people in the car were okay. They said they were okay, that they had hit a horse, and they did not know where the horse was or in what direction it left the scene. Metts testified that he checked the area because, considering the condition of the car, he "figured there was going to be a dead horse laying -- or a broken legged horse or something laying close by[,]" but he never found the horse. Metts testified he went to Courville's property and asked Courville's daughter if there were any horses out, and she responded that she had found two. Metts testified that he and Courville's daughter let "two or three horses[]" that were standing at the gate back into the pasture. Metts could not remember whether Courville had told him whether he had four or five horses, but Metts testified that he accounted for all of Courville's horses that night, and that Courville's horses that were loose exhibited no marks or scratches, were not limping, and exhibited no signs of stress. Metts testified that he did not believe Courville's horses were involved in the accident and that whatever had been hit "would have signs of damage, lots of damage."

The deposition of Lawrence Merendino, Jr. was also attached to Plaintiffs' response. Merendino testified that he has owned a business and property south of Courville's property and that Merendino had seen Courville tending to as many as

three horses on the Pitzola land, which is the fifteen or sixteen acres adjacent to Merendino's business.

Plaintiffs also attached the deposition of Harvey Schneiter, DVM, to their response. In addition to the deposition excerpt included by Defendant in his motion for summary judgment, the deposition attached by Plaintiffs included testimony that "it would make sense" that a horse would show injuries after a collision with a vehicle with the kind of damage the vehicle in this case suffered, but that it would not necessarily "absolutely definitely[]" show injuries. Dr. Schneiter testified, "You would be amazed" at the range of injuries to a horse involved in a collision with a car that suffered significant damage to the front end, the hood, the windshield, and the roof. He had seen "horses get hit by a car like that, hit, roll, land on the ground, get up and walk off and have little more than bruising and some mild abrasions." He had also seen some "catastrophic injuries." Plaintiffs also attached a copy of the accident report, which listed Scott Courville as the owner of the horse involved in the accident. And, in a supplemental response, Plaintiffs attached a "certified copy of Jefferson County's stock law."

Plaintiffs argued in their response that in *Rose* this Court, in finding the summary judgment evidence was no evidence of the landowners "permitting" a bull to roam at large, relied on the following "factors[:]"

14

(1) the Hebert Defendants had not visited the property or entered the gate at any point in time relevant to the date of the collision;

(2) there was no evidence that the Hebert Defendants left the gate open;

(3) there was no evidence that the Hebert Defendants authorized [any third party] the right to leave the gate open;

(4) there was no evidence that the Hebert Defendants authorized the owners of the bull to "the right to run cattle at large";

(5) there was no evidence that the Hebert Defendants had been notified of the bull's escape prior to the collision;

(6) there was no evidence that the Hebert Defendants were aware that any cattle had previously escaped from the pastures they leased; and

(7) there was no evidence that the Hebert Defendants' pasture's fence and its gate were not fit for the ordinary uses for which they were intended.

According to the Plaintiffs here, the evidence "demonstrates that as to six of those seven points [in *Rose*], there is evidence in the affirmative, to wit:"

(1) Mr. Courville lived at the property in question and in fact had been there the morning of the incident before he left for Mexico;

(2) There is direct testimony that the gate was found either in an open position or in a way such that the horses could only have gotten out if it was open;

(3) There is evidence that Courville arranged with "Stretch" Metts to "look after his [horse(s)]" while he was away;

(4) Admittedly, there is no evidence of a specific intent to have the horses run at large;

15

(5) There was evidence that Courville and Metts had been notified of the horse's escape for some time – no less than a few minutes, but up to a couple of hours – before the collision;

(6) There was evidence that Courville's horses, especially those on the "Smith/Pitzola" (South) side of 365, had escaped in the past, particularly in cold weather; and

(7) There was evidence that the pasture on the "Smith/Pitzola" (South) side of 365 was in disrepair and as such allowed for the escapes.

In his Reply to Plaintiffs' Response, Courville asserted that Plaintiffs' summary judgment evidence failed to create a genuine issue of material fact that Courville owned or controlled the horse(s) allegedly involved in the accident in question, and that all of the evidence set forth in Defendant's No Evidence Motion for Summary Judgment establishes that Defendant did not own or control the horse(s). According to Courville, the only two experts in the case (Deputy Metts and Dr. Schneiter) testified that in all probability any horse struck by the Plaintiffs' vehicle would have sustained demonstrable injuries. Courville argued that the best evidence confirms that he owned five horses on the day of the accident and all five of his horses were healthy and unharmed immediately following the crash. Courville also asserted that Plaintiffs failed to create a fact issue that he "permitted" a horse to run at large. According to Courville, Plaintiffs "must prove something greater than the mere presence of a horse on the road." Courville argued that the Plaintiffs offered no evidence of the condition of the gates and fences or that they were improperly

16

secured or in disrepair, no evidence of how and when any gate was opened, no evidence that Metts had the authority to leave the gate open, no evidence how Courville's horses escaped their enclosure, no evidence of how he is at fault other than a horse being outside its pasture, no evidence that he acquiesced to his horse(s) running at large, and no evidence that the horses that allegedly escaped from this property the past ten years belonged to him, and no evidence that his horses have ever escaped an enclosure on his homestead property, and no evidence of the condition or suitability of the Smith/Pitzola fencing on the day of the accident.

The trial court issued a letter ruling sustaining the objections by Courville to some of Plaintiffs' summary judgment evidence and stating the court's intention to grant the no-evidence summary judgment. The trial court noted that "[w]hile there is, actually, some evidence suggesting that the horse did not belong to the defendant, the analysis for purposes of defendant's Motion is whether the plaintiff has produced more than a scintilla of evidence that it was [the Defendant's horse]." The trial court signed an order granting summary judgment on all claims asserted by Plaintiffs. On December 13, 2016, the trial court signed a Final Take-Nothing Judgment granting Courville's no-evidence motion for summary judgment as to all of Plaintiffs' claims and dismissing those claims with prejudice.

17

Appellate Issues

Appellants argue that the trial court erred in granting Courville's no-evidence motion for summary judgment. According to Appellants, "in the case at bar there is indisputable evidence of the wreck, and exceptionally strong circumstantial evidence pointing towards the conclusion that the horse in front of Courville's property during a search for escaped horses known to belong to Courville – was in fact Courville's horse." Appellants also argue that if this Court reaches "the second point raised in [Defendant's] motion . . . despite the [trial] Court's letter ruling, there is sufficient evidence for a jury to determine that Courville had in fact 'permitted' the horse to be on the road as judged by the standards set forth in *Rose v. Hebert Heirs*[, 305 S.W.3d 874 (Tex. App.—Beaumont 2010, no pet.)]."

Standard of Review

The elements of a negligence claim are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 352 (Tex. 2015). After adequate time for discovery, a party may move for a no-evidence summary judgment claiming no evidence exists to support one or more essential elements of a claim or defense on which the opposing party has the burden of proof. Tex. R. Civ. P. 166a(i). In response to a no-evidence motion for summary judgment, the nonmovant must

18

produce summary judgment evidence raising a genuine issue of material fact. *Id.* We review a trial court's summary judgment de novo. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). On appellate review, we view the evidence in the light most favorable to the nonmovant. *Id.* at 601. Material facts can be established with direct evidence, circumstantial evidence, or a combination of both. *Id.* More than a scintilla of evidence exists if the evidence "would allow reasonable and fair-minded people to differ in their conclusions." *Forbes Inc. v. Granada Biosci., Inc.*, 124 S.W.3d 167, 172 (Tex. 2003). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983); *see also Ridgway*, 135 S.W.3d at 601.

## Analysis

On appeal, Plaintiffs argue that the trial court erred in granting summary judgment because there is ample circumstantial evidence from which a reasonable jury could determine that the horse involved in the accident was Courville's horse. Even assuming without deciding that Plaintiffs produced summary judgment evidence raising a genuine issue of material fact that Courville owned or controlled the horse(s) allegedly involved in the accident, summary judgment was proper

19

because Plaintiffs have presented no evidence that Courville breached any duty owed under a negligence or negligence per se claim as alleged in Plaintiffs' petition.

In Texas, there is no common law duty for an owner of livestock to ensure that his animals do not roam at large, including straying onto farm-to-market roadways. *See Gibbs v. Jackson*, 990 S.W.2d 745, 746 (Tex. 1999). Nevertheless, under the Texas Agriculture Code, a local "stock law" created by an election may limit a livestock owner's ability to allow his animals to roam at large. *See generally* Tex. Agric. Code Ann. §§ 143.021-.108 (West 2004 & Supp. 2017). Section 143.021 allows that the "freeholders of a county or an area within a county" may petition for an election to decide "if horses, mules, jacks, jennets, donkeys, hogs, sheep, or goats are to be permitted to run at large in the county or area." *Id.* § 143.021 (West Supp. 2017). Section 143.024 provides that if such stock law is enacted, "a person may not permit any animal of the class mentioned in the proclamation to run at large in the county or area in which the election was held." *Id.* § 143.024 (West 2004). Plaintiffs assert that because Jefferson County enacted such a stock law in 1933, Courville had a duty to not permit his horse(s) from running at large, and that Courville breached that duty.[2]

---

[2] We assume, without deciding, that the Jefferson County stock law is valid. On appeal, Courville contends that the Jefferson County stock law is void as the local election on the law was invalid because (1) the ballot failed to follow

20

Neither the ownership of the animal nor the ownership of the premises creates a rebuttable presumption that the animal's presence on the road was attributable to the negligence of the owner of the animal or the premises. *See Beck v. Sheppard*, 566 S.W.2d 569, 572 (Tex. 1978). Animals may escape through no fault of their owners. *Schumacher v. Caldwell*, 206 S.W.2d 243, 266-67 (Tex. 1947). The fact of an animal's escape is not alone evidence of misconduct on the part of its owner. *Id.*; *Van Horne v. Harris*, No. 2-06-183-CV, 2007 Tex. App. LEXIS 2266, at \*10 (Tex. App.—Fort Worth March 22, 2007, no pet.) (mem. op.) (stating that a violation does not occur solely because an owner's livestock runs at large); *Goode v. Bauer*, 109 S.W.3d 788, 792 (Tex. App.—Corpus Christi 2003, pet. denied) (stating that liability for the violation of livestock laws requires more than the presence of the animals in a forbidden place).

We first address the duty created by section 143.024. Courville contends that because the Legislature in section 143.034 (titled "Penalty") provides that the statutory penalty for a violation of 143.024 is limited to an owner, agent, or person

mandatory ballot language by combining separate and distinct propositions for horses and cattle, and (2) section 143.072 prohibits Jefferson County from conducting a countywide election for the running at large of cattle. Because we decide the dispute on another issue, we defer deciding whether the Jefferson County stock law is void. *See Rose v. Hebert Heirs*, 305 S.W.3d 874, 877 n.7 (Tex. App.—Beaumont 2010, no pet.).

in control of the animal who "knowingly" permits the animal to run at large in an area or county in which the animal is prohibited from running at large under the subchapter, that "Appellants must establish, at a minimum, that Appellee 'knowingly permitted' a horse he owned or controlled to roam onto FM 365[]" for him to be negligent under section 143.024, even though section 143.024 only states a violation for an owner "permit[ting]" his livestock to roam at large. *See* Tex. Agr. Code Ann. §§ 143.024 ("Effect of Election; Adoption of Subchapter"), 143.034 ("Penalty"). In *Rose*, this Court rejected the same argument relating to the same stock law statutes applicable to the free range of cattle, sections 143.074 ("Effect of Election; Adoption of Subchapter") and 143.082 ("Penalty"). *See Rose*, 305 S.W.3d at 880-81.

In *Rose*, Rose drove a car that struck a black bull on a State Highway, and Rose and her three minor passengers sustained injuries in the collision. *Id.* at 875. The minors sued the landowner-defendants, alleging that the bull had escaped from the landowners' property, and that the landowners were negligent in permitting the bull to roam at large, in failing to ensure that the gates on the premises were locked, and in failing to install cattle guards at the pasture's gate. *Id.* This Court noted that although section 143.074 "does not utilize the terms 'negligence' or 'knowingly' to define the scope of the duty created by section 143.074[,]" the penalty provision for

22

section 143.074 limits the persons subject to being fined to those who "knowingly permit[]" cattle to run at large. *Id.* at 880. Because the Legislature did not define the term "permit" for purposes of section 143.074, this Court construed the term according to its common meaning:

> In light of the Legislature's choice to restrict the reach of the statute's penalty provision to those who "knowingly" permit cattle to roam at large, we are skeptical that the Legislature intended the duty it created in section 143.074 to extend to any person "who makes possible" the escape of cattle from a pasture.
>     We conclude that the Legislature likely intended "permit" to mean "to consent to expressly or formally," or to mean "to give leave." These two definitions of the word "permit" found in Webster's Third New International Dictionary appear to us to be the word's common meaning.

*Id.* at 880-81 (footnote omitted).

Applying the same rationale here, in light of the Legislature's choice to restrict the reach of the statute's penalty provision to those who "knowingly" permit livestock to roam at large, we conclude that the Legislature intended that a breach under section 143.024 requires that Courville "consent[ed] to expressly or formally" to his horse(s) running at large or that he "g[a]ve leave" to his horse(s) running at large. *See id.* To establish this, Dearbonne must provide evidence of something more than ownership of the horse by Courville.

23

We next examine the record to determine whether there is more than a scintilla of evidence that Courville "permitted" his horse(s) to run at large. In *Rose*, this Court affirmed the trial court's summary judgment in favor of the landowners and concluded that there was no evidence showing that the landowners "permitted" the bull to roam at large:

> Nothing in the record indicates the Landowners visited the property or that they had entered the gate at any point in time relevant to the date of the collision. There is no evidence that any of the Landowners left the gate open. We find no evidence that the Landowners authorized the bull's owner, the lessee that was granted grazing rights, or any hunters that held hunting rights, the right to leave the gate open. There is no evidence that the Landowners authorized [the bull's alleged owners] the right to run cattle at large. There is also no evidence that the Landowners had been notified of the bull's escape prior to the collision, and there is no evidence that the Landowners were aware that any cattle had previously escaped from the pastures they leased. Finally, there is no evidence that the pasture's fence and its gate were not fit for the ordinary uses for which they were intended.

*Id.* at 881.

A similar analysis was used by the Amarillo Court of Appeals in *Rodriguez v. Sandhill Cattle Co., L.P.*, 427 S.W.3d 507 (Tex. App.—Amarillo 2014, no pet.). In that case, Plaintiff Rodriguez sued Sandhill Cattle Co., L.P. for damages arising from his colliding with cattle on a roadway after midnight. *Rodriguez*, 427 S.W.3d at 508. The accident scene was several miles from where Sandhill, the cattle's owner, had pastured the cattle. *Id.* The pasture was surrounded by a functioning "hot-wire" when

24

the cattle were left there. *Id.* Some cattle escaped the pasture and it was subsequently discovered that the "hot-wire" had been broken. *Id.* At trial and after Rodriquez "rested," the trial court granted Sandhill's motion for directed verdict because Rodriguez had failed to prove a violation of the local stock law. *Id.* The Amarillo Court of Appeals explained that because the case before it was a directed verdict it required the same standard of review as a no-evidence summary judgment. *Id.* In affirming the judgment in favor of Sandhill, the Amarillo Court of Appeals applied this Court's reasoning in *Rose* and concluded that "nothing of record supports a reasonable inference" that Sandhill breached the local stock law by permitting its cattle to run at large:

> Rodriguez cites us to evidence that the cattle in question weighed approximately 500 pounds each, 80 head were placed on 60 acres, only one hot-wire surrounded the pasture, the wire had only one power source, only that portion of the wire near the trough held additional marking, and some of the steers were "bulling." Yet, absent is evidence that steers attempting to copulate with each other charge, wander, stampede, fall, fight, or the like. Nor is there evidence that such conduct was pervasive, happened near the wire, or was immune from impedance from a wire charged with electricity. Similarly missing is evidence that a single strand of 14 gauge electrified wire (like that present here) was insufficient to generally hold cattle like those being pastured. Indeed, the only evidence we found of record was that indicating a single strand of hot-wire was no less sufficient than a three, four, or five strand barbed wire fence.
>
> Evidence that the cattle were not trained to stay within the confines of a hot-wire fence is also missing from the record, as is evidence that the cattle in question had previously escaped from a hot-wire fence, that Sandhill knew the hot-wire fence was inoperative

25

before leaving the cattle, that Sandhill failed to inspect the hot-wire fence to determine if it was operative, that Sandhill failed to periodically inspect the wire once the cattle were left, that Sandhill knew the cattle escaped and did nothing, that Sandhill left or allowed anyone to leave an opening in the hot-wire fence, or that there were too many head of cattle on the 60 acres. Nor do we find evidence from anyone familiar with cattle or their pasturing that can be read as criticizing the pasturing technique used here.

*Id.* at 509-11 (footnote omitted).

Here, there is no evidence that Courville left any gate open or authorized anyone to leave any gate open. There is no evidence of how or when Courville's horse(s) escaped the enclosure. Plaintiffs presented no evidence that while on vacation Courville made no effort to corral his horse upon learning horses were outside their enclosure, no evidence that Courville's fences or gates were in disrepair or unsuitable, and no evidence that Courville's horses had escaped from his property's enclosures on prior occasions. In summary, there is no evidence to show that Courville breached section 143.024 and no summary judgment evidence to raise any inference that Courville "permitted" the horse(s) to escape as prohibited by section 143.024 of the Texas Agriculture Code.

After a careful review of Courville's motion for summary judgment and a thorough examination of the Plaintiffs' responses to the motion, we agree with the trial court that the Plaintiffs have failed to meet their burden of producing more than a scintilla of evidence to show that Courville breached section 143.024. *See*

26

*Rodriguez*, 427 S.W.3d at 509-11; *Rose*, 305 S.W.3d at 881. We affirm the trial court's final summary judgment in favor of Defendant.

      AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on January 26, 2018
Opinion Delivered September 13, 2018

Before Kreger, Horton, and Johnson, JJ.