**AFFIRM; and Opinion Filed August 30, 2019.**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-01403-CV

**EDWINA OLIVER, Appellant**
**V.**
**PAUL SAADI, M.D., Appellee**

**On Appeal from the 162nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-15-07763**

# MEMORANDUM OPINION

Before Justices Schenck, Osborne, and Reichek
Opinion by Justice Schenck

Appellant Edwina Oliver appeals a no-evidence summary judgment in favor of appellee Paul Saadi, M.D. The trial court entered summary judgment after striking Oliver's expert witness's report. In a single issue, Oliver contends the trial court erred in finding her expert's report unreliable. Dr. Saadi contends Oliver waived error by not challenging all possible justifications for the trial court's ruling. For the reasons stated below, we affirm the summary judgment. Because the dispositive issues in this case are settled in law, we issue this memorandum opinion. *See* TEX. R. APP. P. 47.4.

## BACKGROUND

Oliver was treated by Dr. Saadi for a spinal condition. Prior to undergoing surgery, Oliver suffered from a host of conditions, including severe back pain, radicular leg pain on her right leg,

cervical myelopathy, and Parkinson's disease. Her expert described her pre-operative spinal condition as severe stenosis[1] of the spinal canal at L3-4 and L4-5 along with bilateral foraminal stenosis at L3-4 and on the right side of L4-5. In July of 2013, Dr. Saadi operated on Oliver, fusing disks in her back. After the surgery, Oliver experienced foot drop.[2] Her foot strength and mobility measured at zero out of a range of five. However, by December of 2013 Oliver's condition had improved, and she could lift her foot with a strength measured at four out of five.[3]

On July 10, 2015, Oliver filed suit for negligence against Dr. Saadi. In her petition, she contended Dr. Saadi violated the standard of care for a reasonably prudent surgeon, proximately causing her foot drop. Oliver designated Brent Morgan, M.D. as an expert witness on the standard of care and causation and he prepared a report. Dr. Morgan is a board-certified neurological surgeon who is currently the Neurotrauma Director at the Medical Center of Plano.[4] In preparing his expert report, he reviewed the following documents related to Oliver's care: "medical records from Doctors Hospital, medical records from Dr. Saadi, MRI report from Doctors Hospital at White Rock Lake, an MRI scan report from Baylor Diagnostic Imaging Center, a medical record of Dr. Sharisse Stephenson, a medical record of Dr. Vaughan." In his report, Dr. Morgan concludes there were several deviations from the standard of care. He states it is probable that "had it [the foraminal stenosis] been addressed there would not have been a permanent neurological injury." However, the report does not specify what Dr. Morgan believed was the cause of the foot drop.

---

[1] Spinal stenosis is the narrowing of the spaces within one's spine, which can put pressure on the nerves that travel through the spine. *See* https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961.

[2] Foot drop is a general term for difficulty lifting the front part of the foot. *See* https://www.mayoclinic.org/diseases-conditions/foot-drop/symptoms-causes/syc-20372628.

[3] Morgan concedes that the "4/5" is a subjective measurement that differs in meaning between physicians, although he asserts there are certain concrete distinctions between the numeric measurements.

[4] Because Dr. Morgan's qualifications are not at issue in this case, we need not address them further.

On November 24, 2015, Dr. Saadi filed an objection to Dr. Morgan's report and simultaneously filed a motion to dismiss. The trial court issued an order denying the motion to dismiss and overruling Dr. Saadi's objection.

Thereafter, Saadi deposed Dr. Morgan. At the deposition, Dr. Morgan initially testified that he did not know what caused the paralysis. Dr. Morgan also stated during his deposition that foot drop is a known complication of some back surgeries, foot drop following surgery can occur through non-negligent causes, and that the development of foot drop following surgery does not mean "in and of itself" that the surgeon was negligent.

Dr. Morgan was then asked what could have caused the foot drop. He listed several possible causes including transection of the nerve root, severe traction injury, failure to decompress an already compressed nerve, trauma to the nerve with placement of the fusion graft, potential vascular injury, and postoperative hematoma causing compression. At this point in the deposition, Dr. Morgan was unable to say which of the listed possibilities, in reasonable medical probability, caused the foot drop. Dr. Morgan also stated that because he did not know the source of the foot drop, he was unable to say whether earlier treatment would have reversed Oliver's condition. More particularly, Dr. Morgan testified:

> I would say that since nothing was done, I don't know, but *there is a possibility there could have been something there* that was reversible at the time. I don't know because [an MRI or CT] wasn't done. I can't opine about something that was not done.

Later in his deposition, Dr. Morgan was informed of an MRI performed in March of 2014, eight months after Oliver's surgery. He claimed he did not know about this MRI. The March 2014 MRI showed a fluid collection that resulted in "moderate to severe descending nerve root compression, most pronounced at the lower L4 level." Upon learning of the March 2014 MRI, Dr. Morgan revised his opinion and stated that a post-operative hematoma was the probable cause of the paralysis. At this time, he stated that compression of the nerve resulted in a hematoma that

–3–

caused the foot drop. Dr. Morgan acknowledged that no post-operative study of the area was performed prior to March 2014, so he could not know that there was a fluid collection present immediately post-surgery. Moreover, he admitted that he could not say what a post-operative MRI would have shown.

Despite not knowing what an MRI right after surgery would have shown, Dr. Morgan testified that in light of the 2014 MRI, it was more likely than not that a hematoma compressed the nerve in Oliver's foot, causing the foot drop. He stated that this was true even though Oliver's foot drop had improved significantly by December 2013.[5] He further insisted that "things could have been done differently" by Dr. Saadi.

Soon thereafter, Dr. Saadi filed a motion to exclude Dr. Morgan's testimony. The motion challenged the reliability of Dr. Morgan's opinions, arguing Oliver did not meet her burden of establishing that Dr. Morgan's opinions are reliable, especially with regard to causation. A few weeks later, Dr. Saadi filed a no-evidence motion for summary judgment, in which he argued that if the motion to exclude Dr. Morgan is granted, Oliver would be without expert testimony to support her claims regarding the standard of care, the breach of the standard of care, and causation. Expert testimony is typically required in medical malpractice cases in Texas to develop those issues. *See Rich v. Mulupuri*, 205 S.W.3d 1, 2 (Tex. App.—Dallas 2006, pet denied).

The trial court held a hearing on Dr. Saadi's motion to exclude Dr. Morgan to determine whether the expert evidence would become part of the summary judgment record. At the hearing, counsel presented arguments and Dr. Morgan testified. Specifically, Dr. Morgan testified that multiple things could have caused the foot drop, he did not know what caused the foot drop in this

---

[5] Before the trial court the parties presented evidence that Oliver's foot drop improved significantly between the surgery and December 2013, even though the March 2014 MRI showed the fluid was still compressing the nerve months later and the radiology studies show the fluid collection grew over the next year. Oliver pointed out this inconsistency to the trial court. At oral argument before this Court, Oliver argued the evidence in support of this that was before the trial court was incorrect. Specifically, she stated that evidence presented was looking an incorrect section of the MRI and that the inconsistency identified at the trial level was not actually an inconsistency. Whether or not that is true, our obligation is to review the evidence that was properly before the trial court. The evidence properly before the trial court showed that the foot drop improved in the same time frame that the fluid collection supposedly causing it grew in size.

case, and that some of the possible causes of the foot drop would not have been negligence on the part of Dr. Saadi.

Dr. Morgan also testified that the purpose of a post-operative radiology study would have been "to see if there was something that could have been corrected." Again, Dr. Morgan did not provide any evidence to support his assumption that a fluid collection existed around the time of the surgery; only that one existed eight months later. At the hearing, the following exchange occurred between Dr. Saadi's attorney and Dr. Morgan.

> Q: Dr. Morgan, from the day of surgery in July of 2013 until the MRI in March of 2014, you don't know along that spectrum because a film wasn't done, when that fluid collection would have been at it[]s maximum, true?
>
> A: Correct. Can I correct that? I mean, I can extrapolate but I can't point to something that says that. I can make an assessment of that, but I can't tell you for sure but I can tell you what my feeling is. And I think I answered with Mr. Goetzmann's question.
>
> Q: Dr. Morgan, you can't say because those film studies weren't done, you don't know if it got bigger or got smaller, you don't know, true?
>
> A: Well, once again, I think this is a -- where you and I kind of -- I misunderstand your questions. It's not that I don't know. I'm highly suspicious. But I can't -- if you're going to say well show me that that's true. I can tell you that in my opinion, in my medical experience, it's very likely that it was at its biggest immediately when the neurological deficit occurred and smaller later. That's my opinion. That would be my -- you know, that would make sense, and I think that's the right extrapolation.

Dr. Morgan's statements that he could "extrapolate," he "didn't know for sure," "I can tell you what my feeling is," and "I think that's the right extrapolation" are reflective of his responses throughout the hearing. Aside from the fact that an MRI showed the existence of the fluid pool eight months after surgery, the evidence before the trial court did not include further analysis or reasoning supporting the proposition that the fluid was present immediately after Oliver's surgery or in the months in between.

At the conclusion of the hearing, the trial court requested supplemental briefing on two issues. First, whether Dr. Morgan was required as a matter of law to rule out all other possible

causes of the foot drop. Second, whether Dr. Morgan's testimony was sufficient on the issue of whether "fluid was present at the time of surgery." The parties submitted supplemental briefing on both issues.

Upon review, the trial court granted both the motion to exclude Dr. Morgan and the no-evidence motion for summary judgment. Each order stated that the related motion was granted in its entirety. The court did not specify its reasons for excluding the report; neither order explained the court's rationale. Oliver moved for a new trial, which was denied by operation of law. He then timely filed this appeal. We must now determine whether the trial court abused its discretion in finding Morgan's testimony unreliable.

## WAIVER UNDER ST. JOHN

As an initial matter, we pause to address a creative argument brought forward by Dr. Saadi; namely, that we must not review the merits of this appeal because Oliver has not adequately briefed her challenge to the admissibility decision under our decision in *St. John Missionary Baptist Church v. Flakes,* 547 S.W.3d 311 (Tex. App.—Dallas 2018, pet. pending) (en banc). Specifically, Dr. Saadi argues that Oliver waived error by not challenging what Dr. Saadi avers are unchallenged "grounds" that could have served as the basis for the trial court's admissibility ruling, including several attacks on Dr. Morgan's methodology, the foundational data underlying his opinions, and the analytical gaps within his opinions, among others not specifically parried in Oliver's brief.

In *St. John* we reaffirmed our application of the briefing waiver implications of *Malooly Brothers, Inc. v. Napier*, 461 S.W.2d 119 (Tex. 1970) beyond summary judgments. *St. John*, 547 S.W.3d at 315. While parties are no longer required to "assign" or identify points of error, they are required to bring forward "issues" sufficient to permit an appellate court to reverse the underlying judgment. *Id.* The "issues" an appellant is obliged to raise under *St. John* and its

antecedents are, again, a product of the presence of multiple independent bases available for the underlying judgment, the lack of any explicit choice among them by the trial court, and the harmful error rule. *Id.* "If an independent ground fully supports the complained of ruling or judgment, but the appellant assigns no error to that independent ground, we must accept the validity of that unchallenged independent ground, and thus any error in the grounds challenged on appeal is harmless because the unchallenged independent ground fully supports the complained of ruling or judgment." *Id.* (quoting *Oliphant Fin. LLC v. Angiano*, 295 S.W.3d 422, 424 (Tex. App.—Dallas 2009, no pet.)).

The word "grounds" still has a specific meaning in summary judgment practice. *See* TEX. R. CIV. P. 166a(c). An admissibility determination, standing on its own, does not compel a summary judgment. As the "issue" in this case is the propriety *vel non* of the court's decision to render summary judgment, Oliver is obliged to attack every ground that by and of its own force could have produced the judgment. He is not obliged to marshal and attack every subsidiary argument and citation to authority that may have informed the trial court's thinking along the way. To be sure, the arguments relating to the admission or exclusion of evidence may vary and here include qualifications, reliability, and relevance. But none of these interstitial evidentiary debates would amount either to a "ground" for summary judgment on their own account. And none of the "justifications" appellee points out in her brief are "independent grounds" on which the trial court could have granted summary judgment. Accordingly, we move forward to decide this appeal on its merits.

### STANDARD OF REVIEW

We review a trial court's decision to exclude expert-witness testimony for an abuse of discretion. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). A trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any

guiding rules or legal principles. *E.I du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

For an expert's opinion to be admissible under Texas Rule of Evidence 702, the expert must be qualified, and the expert's opinion must be relevant to the issues in the case and based upon a reliable foundation. TEX. R. EVID. 702; *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002); *Gammill v. Jack Williams Chevrolet, Inc*. 972 S.W.2d 713, 720 (Tex. 1998); *Robinson*, 923 S.W.2d at 556 (Tex. 1995). The relevance requirement, which incorporates traditional relevancy analysis under Texas Rules of Evidence 401 and 402, is met if the expert testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Robinson*, 923 S.W.2d at 556 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985)).

Rule 702's reliability requirement focuses on principles, research, and methodology underlying an expert's conclusions. *Id.* at 557. Under this requirement, expert testimony is unreliable if it is not grounded "in the methods and procedures of science" and is no more than a "subjective belief or unsupported speculation." *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)). Reliable expert testimony must be based on a probability standard, rather than on mere possibility. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015)

Expert testimony is also unreliable if there is too great an analytical gap between the data the expert relies upon and the opinion offered. *Gammill*, 972 S.W.2d at 727. In applying this reliability standard, the trial court does not decide whether the expert's conclusions are correct; instead, the trial court determines whether the analysis used to reach those conclusions is reliable. *Id.* at 728.

When an expert is challenged, the proponent of the expert opinion must prove the reliability of each opinion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006). The proponent bears this burden "regardless of the quality or quantity of the opposing party's evidence on the issue and regardless of whether the opposing party attempts to conclusively prove the expert testimony is wrong." *Whirlpool v. Camacho*, 298 S.W.3d 631, 639 (Tex. 2009). This burden includes ensuring that the expert's testimony contains no internal inconsistencies. *See Gen. Motors Corp. v. Iracheta*, 161 S.W.2d 462, 470–72 (Tex. 2005).

The trial court serves as a gatekeeper to screen out irrelevant and unreliable expert evidence. *Zwahr*, 88 S.W.3d at 629. The trial court has broad discretion to determine the admissibility of evidence, and we review the trial court's decision under an abuse of discretion standard. *Id.* A trial court abuses its discretion when it acts without regard to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). Whether a trial court abused its discretion in making an evidentiary ruling is a question of law. *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 647 (Tex. 2001).

### OLIVER'S ARGUMENT ON APPEAL

On appeal, Oliver raises two primary arguments. First, Oliver employs a beekeeper analogy found in *Gammill* to argue that Dr. Morgan has many firsthand observations of patients suffering from post-neurological sequelae,[6] making his experience sufficient as long as there is no gap in his opinion rendering it unreliable. *See Gammill*, 972 S.W.2d at 724 (distinguishing scientific and non-scientific expert testimony by explaining that if one wants to know how a bumblebee flies, an aeronautical engineer might be a helpful witness. But, if one wanted to prove bumblebees always take off into the wind, a beekeeper with no scientific training would be an acceptable witness if a proper foundation were laid for his conclusions). We conclude the

---

[6] Neurological sequelae are complications involving damage to the central nervous system that result in cognitive, sensory, or motor deficits.

testimony in this case is not sufficiently analogous to *Gammill* and that the trial court would not have abused its discretion in finding there is indeed an analytical gap rendering Dr. Morgan's testimony unreliable.

In this case, the observations Dr. Morgan made in his career led him to the conclusion that the foot drop might have resulted from up to six different causes. He also conceded that foot drop was also a known complication of the surgery that could occur without negligence on the part of the surgeon. Upon observing the March 2014 MRI, he elevated one of the six "possible" causes to "probable." We find Dr. Morgan's analysis contained a material analytical gap such that the trial court would not have been abusing its discretion in determining the analysis was unreliable. The March 2014 MRI was performed eight months after the surgery took place. No MRI was performed on the area immediately after the surgery. Although the evidence before the trial court showed there was a fluid collection present in March 2014, no evidence showed the presence of a fluid collection immediately following the operation. Moreover, Dr. Morgan admitted that he could not say what an MRI taken post-surgery would have shown and he was unable to say that a fluid collection existed at that time. Additionally, the evidence before the trial court showed Oliver's foot drop improved significantly between the surgery and December 2013, even though the March 2014 MRI showed the fluid was still compressing the nerve months later and the radiology studies show the fluid collection grew over the next year.

Dr. Morgan was not able to explain how, if the fluid pool was the cause of the foot drop, the foot drop could improve while the fluid pool causing it increased in size. Oliver's burden of proving reliability included showing his expert's opinion did not contain internal inconsistencies such as this one. *See Gen. Motors Corp.* 161 S.W.2d at 470–72. Lastly, Oliver's reliance on *Gammill* improperly attempts to equate an expert's qualifications with the reliability of his conclusions. While, as we stated *supra*, Dr. Morgan's qualifications are not at issue, even the most

–10–

qualified expert is still required to show his opinion does not have an analytical gap. *Gammill* at 727. While Dr. Morgan has undoubtedly observed many post-operative complications, his observations led him to the conclusion that six different things could have caused the foot drop. Allowing him to make the leap to his conclusion that, based only on an MRI taken 8 months post-surgery, it was a post-operative hematoma compressing the nerve that caused the foot drop, would ignore the obvious analytical gaps and promote decision making on a well-informed hunch.

Oliver also relies on *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 215–16 (Tex. 2010) to argue that courts have found the differential diagnosis method used by Dr. Morgan to be reliable in determining causation.[7] She contends that under *Crump,* while it is the sponsor's burden to bring forth sufficient evidence to establish the reliability of the expert once challenged, without evidence that the alternative causes Dr. Morgan listed could be negated, the trial court had no basis for concluding that Oliver did not meet his burden under the differential diagnosis framework. Oliver does not direct us to any authority requiring a defendant to show that the extant alternative possible causes could be negated, and we have found none. The Supreme Court has held that any methodology that fails to rule out other viable possible causes for a plaintiff's symptoms does not satisfy the *Robinson* requirements. *See Havner,* 953 S.W.2d at 720 ("Further, if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty"); *Robinson,* 923 S.W.2d at 558–59 ("Dr. Whitcomb conducted no testing to exclude other possible causes of the damage to the Robinsons' pecan orchard, even though he admitted in his deposition that many of the symptoms could be caused by something other than contaminated Benlate."). As Dr. Morgan himself acknowledged, non-negligent results of spinal surgery could result in foot drop. There was also evidence before

---

[7] Before the trial court and before this Court the parties argue multiple things about the differential diagnosis and Dr. Morgan's use of it in this case. We find it unnecessary to discuss the merits of those arguments here and decline to do so, as our conclusion may be reached without such a discussion.

the court that Oliver suffered from cervical myelopathy and Parkinson's disease, and that each of these conditions can cause clumsiness and difficulty with one's gait. Although Dr. Morgan never personally examined Oliver, he admitted that the physicians who had examined her had reached these conclusions and he had no reason to disregard those diagnoses.

In light of the analytical gaps and internal inconsistencies in Dr. Morgan's testimony, we conclude the trial court did not abuse its discretion in excluding Dr. Morgan's expert testimony. We are unpersuaded by Oliver's arguments to the contrary. The record shows the trial court considered and applied the guiding rules and principles applicable to the reliability of expert witness testimony. *See Gammill,* 972 S.W.2d at 727; *Robinson,* 923 S.W.2d at 556–57.

### SUMMARY JUDGMENT

Oliver properly concedes that absent Dr. Morgan's opinion testimony there is no evidence available in the summary judgment record to support a reversal. *See JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015). Because Oliver had no expert evidence of the causation of his injuries, the trial court did not err by granting Dr. Saadi's no-evidence motion for summary judgment. *See id*.

### CONCLUSION

We overrule Oliver's sole issue and affirm the trial court's judgment.


/David J. Schenck/
DAVID J. SCHENCK
JUSTICE


171403F.P05


–12–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

EDWINA OLIVER, Appellant

No. 05-17-01403-CV      V.

PAUL SAADI, M.D., Appellee

On Appeal from the 162nd Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-15-07763.
Opinion delivered by Justice Schenck.
Justices Osborne and Reichek participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.  It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 30th day of August, 2019.